**PROJECTS UNLIMITED, INC., a Utah corporation, Plaintiff and Appellant,**

v.

**COPPER STATE THRIFT & LOAN CO., Valley Bank & Trust Co., Cottonwood Thrift & Loan Co., Western Savings & Loan Co., Bradshaw Development Co., et al., Defendants and Appellees.**

No. 860340.

Supreme Court of Utah.

Sept. 6, 1990.

Rehearing Denied Oct. 11, 1990.

facts are not *genuinely controverted.  See Heglar Ranch,* 619 P.2d at 1391.

**740**

Ellen Maycock, Robert F. Babcock, and Darrel J. Bostwick, Salt Lake City, for plaintiff-appellant.

Jon C. Heaton and James Boevers, Salt Lake City, for Copper State Thrift & Loan Co., Valley Bank & Trust Co., Cottonwood Thrift & Loan Co., and Western Sav. & Loan Co.

Jeffrey M. Jones, Salt Lake City, for Copper State.

Dennis V. Haslam and Kathy A. F. Davis, Salt Lake City, for Cottonwood Thrift.

Steven D. Crawley, Salt Lake City, for Bradshaw Development Co.

Richard H. Nebeker, Salt Lake City, for Metler.

Matthew F. Hilton, Draper, for Stringfellow and Highland Orchards.

Allen Sims and Gary E. Doctorman, Salt Lake City, for Hugo F. Diederick.

Richard A. Rappaport, Salt Lake City, for Carolyn L. Nielsen.

Julian D. Jensen, Salt Lake City, for Brent Ivie Elec., Inc.

Bruce A. Maak, Salt Lake City, for Deseret Pacific Mortg. and Scott A. Kafesjian.

**GREGORY K. ORME, Court of Appeals Judge:**

Projects Unlimited, Inc., appeals from a summary judgment invalidating its mechanic's lien against the interests of Copper State Thrift & Loan Company, Valley Bank & Trust Company, and Cottonwood Thrift & Loan Company, Inc. We affirm the summary judgment as to Cottonwood Thrift, but reverse as to Copper State and Valley Bank.

## I. FACTS

Bradshaw Development Company, Inc. ("Bradshaw"), owned a parcel of land, the Highland Orchards property, which it planned to develop into the Highland Orchards Condominium project. The property was divided into two parcels with the objective of constructing condominiums in two phases—phase I and phase II. Phase I, when completed, would consist of eighteen condominium units. Bradshaw engaged Projects Unlimited, Inc. ("Projects") to construct some of the phase I units. In September 1982, Bradshaw and Projects entered into a contract for the construction of two units—FF–6–A1 and FF–6–B1, hereinafter referred to as units 1 and 2. Those parties entered into a second contract in April 1983 concerning the contruction of six additional units—FF–5–A1, FF–5–B1, FF–11–A1, FF–11–A2, FF–11–B1, and FF–11–B2, hereinafter referred to as units 3 through 8, respectively. The contracts allocated prices on a per-unit basis.

Copper State Thrift & Loan Company financed construction of the eight units. The Copper State loan to Bradshaw was secured by two trust deeds. The first deed was recorded in December 1982 and covered units 1 and 2. The second deed was recorded in June 1983 and covered units 3 through 8.

Relying on the terms of its loan agreement with Bradshaw, Copper State refused to advance additional funds to Bradshaw in June 1983. Sometime thereafter, Bradshaw stopped making payments to Projects. On October 7, 1983, Projects ceased construction with a substantial balance still owing to Projects. Bradshaw did

not record its condominium declaration until August 1983.

During construction, units 1, 2, and 3 were sold. The sales of units 1 and 2 were financed by Valley Bank & Trust Company, which recorded trust deeds on those units in May 1983. Copper State subordinated its December 1982 trust deed to the May 1983 trust deeds of Valley Bank. The sale of unit 3 was financed by Western Savings & Loan Company, which is not a party to this appeal. After construction was halted, units 4 and 5 were sold. The sales of these units were financed by Cottonwood Thrift & Loan Company and secured by trust deeds recorded in December 1983.

In November 1983, Projects recorded a notice of mechanic's lien against the Highland Orchards property. The notice described Bradshaw as the owner of the subject property. The lien notice described the property by a metes and bounds description including all of the phase I and phase II property.[1] The notice did not describe the eight constructed units, by employing their descriptions as used in the condominium declaration or otherwise, nor did it allocate unpaid amounts attributable to each unit. The notice did not distinguish between work performed under the September 1982 and April 1983 contracts. The notice of lien cited the construction starting date as October 10, 1982, and the ending date as October 7, 1983. Although the notice of lien contained the signature and seal of a notary and the date of notarization, it did not give the notary's address or commission expiration date.

Bradshaw and Projects negotiated to release from the lien units 4 and 5, financed by Cottonwood Thrift. The lien release specifically stated that units 4 and 5 were released from the scope of the lien in exchange for the payment of $90,000. Thereafter, Projects filed an amended notice of lien. The amended notice was essentially identical to the initial notice except that $85,000 was added to the "credits and off-

sets" figure and subtracted from the "balance owing" figure. The same metes and bounds description was used to describe the property. The amended notice did not exempt units 4 and 5 from the property description, but attached to it were a map of the entire condominium project and a copy of the partial release.

Projects commenced an action to foreclose the lien and recorded a lis pendens in March 1984. The complaint alleged that Bradshaw had breached its contracts with Projects. The complaint also called for a determination of priorities among the various claimants. Valley Bank was not named as a defendant in the complaint but had actual knowledge of the action at least by August 1984, when it reviewed a title report showing Projects' lis pendens and initiated relevant correspondence with Projects. On May 24, 1985, almost twenty months after it ceased construction, Projects filed an amended complaint which joined Valley Bank and others as defendants. Bradshaw failed to answer either complaint, and a default judgment was entered against it in December 1985.

Copper State, Cottonwood Thrift, Valley Bank, and Western Savings ("the Banks") moved for summary judgment on the remaining claims. They collectively argued that Projects' lien was invalid under the mechanic's lien statute and under the Condominium Ownership Act. Essentially, their arguments under the mechanic's lien statute were that (1) the jurat lacked the notary's address and the date her commission expired, (2) the notice describes more property than was actually subject to the lien, (3) the notice describes property which Bradshaw initially did not own, and (4) the lien did not distinguish between work performed under the September 1982 and April 1983 contracts. The Banks also argued that the Condominium Ownership Act required Projects to file a separate lien on each condominium unit as described in the condominium declaration.

---

1. Accordingly, the metes and bounds description was not confined to the property on which the eight units constructed by Projects were located. However, it appears from the record

that the only new structures on any part of the Highland Orchards property were the units constructed by Projects.

Valley Bank also argued that Projects had failed to join it as a defendant within the statutorily prescribed time and was therefore barred from later amending its complaint to add that bank as a defendant. Moreover, Cottonwood Thrift argued that it was not a proper party to the suit because Projects had released the units it financed from the scope of the lien. Projects filed a cross-motion for partial summary judgment on its claim against Copper State, its construction lender.

The trial court granted the Banks' summary judgment motions and denied Projects' motion. The court concluded that (1) Projects had unequivocally released from the lien's coverage the units financed by Cottonwood Thrift, (2) Projects failed to join Valley Bank as a party within the required time, and (3) the lien was invalid due to improper notarization "and on grounds otherwise set forth in the moving defendants' memoranda on file."

On appeal, Projects challenges each of the trial court's conclusions. Primarily, it argues that Utah does not require a lien notarization to contain the notary's address and/or commission expiration date.

The Banks assert the same arguments on appeal that they asserted in the trial court. In particular, they argue that we should affirm the trial court's decision on the notarization issue. Moreover, the Banks assert that, even assuming we were to agree with Projects on the notarization issue, we can and should affirm the summary judgment due to other failures in the lien notice. And indeed, "we may affirm trial court decisions on any proper ground(s), despite the trial court's having assigned another reason for its ruling." *Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988); *see also State v. One 1979 Pontiac Trans Am*, 771 P.2d 682, 684 (Utah Ct.App. 1989). The Banks also cross-appeal, seeking an award of attorney fees in the district court and on appeal.

## II. STANDARD OF REVIEW

■ "Summary judgment is proper only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc.*, 789 P.2d 24, 25 (Utah 1990); *see* Utah R.Civ.P. 56(c). In our determination of whether the trial court properly granted summary judgment, we must review the facts in the light most favorable to the losing party. *E.g., Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1385 (Utah 1989). Moreover, we review the trial court's legal conclusions for correctness and give no particular deference to that court's view of the law. *Id.*

## III. MECHANIC'S LIENS GENERALLY

We begin our analysis by recognizing that "[t]he purpose of the mechanic's lien act is remedial in nature and seeks to provide protection to laborers and materialmen who have added directly to the value of the property of another by their materials or labor." *Calder Bros. Co. v. Anderson*, 652 P.2d 922, 924 (Utah 1982). On the other hand, we recognize that liens create "an encumbrance on property that deprives the owner of his ability to convey clear title and impairs his credit," *First Sec. Mtg. Co. v. Hansen*, 631 P.2d 919, 922 (Utah 1981), a fact the importance of which is magnified by the pre-recordation priority accorded a valid mechanic's lien. *See* Utah Code Ann. § 38–1–5 (1988). State legislatures and courts attempt to balance these competing interests through their mechanic's lien statutes and judicial interpretations thereof.

■ Mechanic's liens are purely statutory, and lien claimants may only acquire a lien by complying with the statutory provisions authorizing them. *Utah Sav. & Loan Assoc. v. Mecham*, 12 Utah 2d 335, 338, 366 P.2d 598, 600 (1961). However, Utah courts have recognized that substantial compliance with these provisions is all that is required.[2] *Chase v. Dawson*, 117

---

2. The Banks do not argue that Projects completely failed to comply with any of the particular requirements of Utah Code Ann. § 38–1–7

Utah 295, 296, 215 P.2d 390, 390 (1950); *see also Graff v. Boise Cascade Corp.*, 660 P.2d 721, 722 (Utah 1983). Moreover, we have stated that "[a] lien once acquired by labor performed on a building with the consent of the owner should not ... be defeated by technicalities, when no rights of others are infringed, and no express command of the statute is disregarded." *Eccles Lumber Co. v. Martin*, 31 Utah 241, 249, 87 P. 713, 716 (1906) (quoting 20 Am. & Eng. Encyclopedia of Law 276); *see also Mickelsen v. Craigco, Inc.*, 767 P.2d 561, 563 (Utah 1989). Courts from other states also subscribe to this view. *See, e.g., H.A. M.S. Co. v. Electrical Contractors of Alaska, Inc.*, 563 P.2d 258, 263 (Alaska 1977); *Horseshoe Estates v. 2M Co.*, 713 P.2d 776, 781 (Wyo.1986).

Although courts have differing opinions about how liberally to construe provisions within their mechanic's lien statutes, "the modern trend is to dispense with arbitrary rules which have no demonstrable value in a particular fact situation." [3] *Consolidated Elec. Distribs., Inc. v. Jepson Elec. Contracting, Inc.*, 272 Or. 376, 380, 537

P.2d 80, 83 (1975). Utah has followed this trend both in the legislature and in the courts. A legislative example of this trend is the 1985 amendment to section 38–1–7 of the mechanic's lien statute. The 1985 amendment greatly simplified the mechanic's lien notice, dispensing with several of the more cumbersome lien notice requirements.[4] One judicial example of this trend is *Mickelsen*, in which this court clarified the lien verification process and dispensed with the notion that the claimant's verification required any formal ritual. 767 P.2d at 563.

■ With these general principles in mind, we turn to the particular arguments in this case. We must determine whether the rigorous interpretations urged by the Banks are necessary to protect the interests of the parties in the instant situation. Unless we find that Projects' alleged failures have compromised a purpose of the mechanic's lien statute, those failures will be viewed as technical, and in the absence of any prejudice, we will uphold the lien.[5]

---

(1983). Rather, they argue that Projects' efforts did not substantially comply with the statutes.

3. This trend is not confined to this area of the law but can be seen in others as well. *See, e.g., Tech–Fluid Servs., Inc. v. Gavilan Operating, Inc.*, 787 P.2d 1328 (Utah Ct.App.1990). In *Tech–Fluid*, the Utah Court of Appeals took a similar position in the area of redemption. The court concluded that where the provisions in the redemption statute are "procedural in nature and do not affect any substantive rights of the purchaser ... [substantial] compliance is all that is necessary." *Id.* at 1334.

4. The current version of section 38–1–7 provides in pertinent part:
   (2) This notice shall contain a statement setting forth the following information:
   (a) the name of the reputed owner if known or, if not known, the name of the record owner;
   (b) the name of the person by whom he was employed or to whom he furnished the equipment or material;
   (c) the time when the first and last labor or service was performed or the first and last equipment or material was furnished;
   (d) a description of the property, sufficient for identification; and
   (e) the signature of the lien claimant or his authorized agent and an acknowledgment or certificate....

Utah Code Ann. § 38–1–7 (Supp.1990). Requirements under the 1984 version of this provision which are no longer part of the statute include actual verification of the statements in the lien notice, "a statement of [the claimant's] demand after deducting all just credits and offsets ... [, and] a statement of the terms, time given and conditions of his contract...." Utah Code Ann. § 38–1–7 (Supp.1983).

5. It is important to emphasize the scope of this opinion. Our focus is of course upon the particular parties and particular facts in this case, but it is further narrowed by the "as a matter of law" standard implicit in reviewing summary judgments. It may well be that the same lien notices would have worked significant prejudice on other parties not before us, such as owners of, or lenders secured by, the phase II parcel to which Projects had no valid claim. Thus it is entirely possible that we would invalidate this same notice as it applied to another party who could demonstrate prejudice. *Cf. Horseshoe Estates v. 2M Co.*, 713 P.2d 776, 781 (Wyo.1986) (holding lien sufficient as against party who failed to demonstrate prejudice or that it was misled). It is even conceivable that the Banks, or some of them, could demonstrate actual prejudice in the context of a trial. At this juncture, however, we only consider the Banks' contention that the liens are so flawed as to simply be void, regardless of any actual prejudice.

## IV. INVALIDITY OF THE LIEN UNDER SECTIONS 38–1–7 AND –8

Sections 38–1–7 and 38–1–8 of Utah's mechanic's lien statute identify the statutory elements of a lien notice. At the time the dispute arose, section 38–1–7 provided that every notice of lien recorded with the county recorder must contain

a notice of intention to hold and claim a lien, and a statement of his demand after deducting all just credits and offsets, with the name of the reputed owner if known or if not known, the name of the record owner, and also the name of the person by whom he was employed or to whom he furnished the material, with a statement of the terms, time given and conditions of his contract, specifying the time when the first and last labor was performed, or the first and last material was furnished, and also a description of the property to be charged with the lien, sufficient for identification, which claim must be verified by the oath of himself or of some other person.

Utah Code Ann. § 38–1–7 (Supp.1983).[6] Section 38–1–8 provided:

Liens against two or more buildings or other improvements owned by the same person may be included in one claim; but in such case the person filing the claim must designate the amount claimed to be due to him on each of such buildings or other improvements.

Utah Code Ann. § 38–1–8 (1988).

### A. Failure of the Jurat

At the time the dispute arose, Utah Code Ann. § 38–1–7 (Supp.1983) provided that every notice of lien "must be verified by the oath of [the lien claimant] or of some other person." The district court found that a proper verification under section 38–1–7 required compliance with Utah Code Ann. § 46–1–8 (1953), which provided: "To all acknowledgments, oaths, affirmations and instruments of every kind taken and certified by a notary public he shall affix to

his signature his official title and his place of residence and the date on which his commission expires." The court then concluded that the notary's failure to include her address and commission expiration date in the jurat invalidated the verification, which made the lien void. We disagree.

Initially, we note that verification is an essential part of a lien notice and "not a hypertechnicality that we can discount." *First Sec. Mtg. Co. v. Hansen*, 631 P.2d 919, 922 (Utah 1981).[7] Verification by the lien claimant was thought necessary so that "[f]rivolous, unfounded, and inflated claims can thereby be minimized, and the prejudgment property rights of the [property owners] receive their due protection." *Id.* Verification accomplishes this purpose by creating "the possibility of perjury prosecution for verifying a false lien claim." *H.A.M.S. Co. v. Electrical Contractors of Alaska, Inc.*, 563 P.2d 258, 264 (Alaska 1977) (lien must be signed by claimant; corporate acknowledgment insufficient).

Although the 1983 mechanic's lien statute requires verification, Utah Code Ann. § 38–1–7 (Supp.1983), it does not state any particular procedure for verification. Those procedures have developed judicially in cases like *First Security Mortgage*. One of the most recent and instructive cases defining these procedures is *Mickelsen v. Craigco, Inc.*, 767 P.2d 561 (Utah 1989), decided after the trial court made its ruling in this case. In *Mickelsen*, we listed the essential elements for a proper verification: "(1) [T]here must be a correct written oath or affirmation, and (2) it must be signed by the affiant in the presence of a notary or other person authorized to take oaths, and (3) the latter must affix a proper jurat." *Id.* at 564. The Banks do not contest that an oath was made or that it was signed before a notary. They simply argue that the notary failed to affix a "proper jurat" because she omitted her ad-

---

6. Section 38–1–7 has been amended since 1983. *See supra* note 4.

7. In *First Security Mortgage*, a lien notice was held invalid because the lien claimant failed to

sign the oath. The notice was insufficient even though the notary had signed the certificate. *See also Worthington & Kimball Constr. Co. v. C & A Dev. Co.*, 777 P.2d 475 (Utah 1989).

dress and the expiration date of her commission.

■■■ The Banks would have us adopt a position requiring strict compliance with the *notary public statute* in order to satisfy the verification requirement of the mechanic's lien statute as expounded in *Mickelsen*. We decline to adopt this position. A jurat is "merely evidence of the fact that the oath was properly taken before the duly authorized officer." 50 C.J.S. *Jurat* 705 (1947); *see also Stern v. Board of Elections,* 14 Ohio St.2d 175, 181, 237 N.E.2d 313, 317 (1968); *Craig v. State,* 232 Ind. 293, 295, 112 N.E.2d 296, 297 (1953) (purpose is to evidence that oath was made before authorized officer). In view of this principle, because the jurat in this case clearly evidenced that the oath was given before a notary, it should be considered adequate. And even assuming that the legislature intended the inclusion of a jurat which conformed with the notary statute,[8] substantial compliance would certainly be sufficient to satisfy that requirement. *E.g., Chase v. Dawson,* 117 Utah 295, 296, 215 P.2d 390, 390 (1950).

In this case, the jurat contained the notary's signature, the date, and her official seal. These items were sufficient to evidence the fact that the document had been verified. Moreover, anyone who questioned the validity of the notarization could certainly confirm its authenticity with the simplest inquiry. Thus, we find that the lien's notarization substantially complied with the mechanic's lien and notary statutes. *See, e.g., Georgia Lumber Co. v. Harrison Constr. Co.,* 103 W.Va. 1, 5, 136 S.E. 399, 401 (1927) (notice sufficient though notary failed to affix official seal in contravention of statute); *Stern,* 237 N.E.2d at 317–19 (failure of notary to affix

signature to jurat did not invalidate affidavit).

The purpose of the verification requirement is to assure that lien claimants file legitimate claims. *First Sec. Mtg.,* 631 P.2d at 922; *see also H.A.M.S.,* 563 P.2d at 264. In *First Security Mortgage* and *H.A. M.S.,* liens were held invalid because the lien notices did not contain the signature of the claimants but simply the signature of a notary attesting to the oath of the claimants. Unlike with the notices in those cases, the president of Projects signed an oath that the contents of the lien notice were true and the notary attested to this fact. We see no policy reason why the notary's technical failure to include her address and commission expiration date increased, in any way, the likelihood that Projects would file a frivolous claim, especially since her failure presumably occurred *after* the verification was signed by the president.

For the above reasons, we find that the lien notice substantially complied with the "proper jurat" requirement established in *Mickelsen*.[9]

## B. Other Grounds

Though we disagree with the trial court's legal conclusion on the notarization issue, we may still affirm the summary judgment based upon one of the other failures in the lien notice. The Banks argue that the lien notice is invalid because the metes and bounds description in the notice (1) covers more than one condominium unit *without* specifically referencing each, (2) describes more property than is actually subject to the lien, and (3) describes property which was not initially owned by Bradshaw and because the notice fails to distinguish between work completed under the two separate contracts.

---

**8.** In 1989, the legislature amended the mechanic's lien statute to specifically provide a particular jurat form. The current statute requires "an acknowledgment or certificate as required under Chapter 3, Title 57." Utah Code Ann. § 38–1–7(2)(e) (Supp.1990).

**9.** We recognize that this conclusion is inconsistent with *In re Williamson,* 43 B.R. 813 (D. Utah 1984), on which the trial court heavily relied.

In *Williamson,* the bankruptcy court found that each element listed in section 46–1–8 was an essential part of a notary's certificate even when made on a mechanic's lien. *Id.* at 823. Utah law was admittedly unclear on this point when *Williamson* was decided. Nonetheless, we disagree with the analysis in *Williamson* and hold to the contrary.

These other grounds essentially challenge the descriptive contents of the lien notice. The purpose for descriptive terms in a lien notice is to adequately inform interested parties of the existence and scope of the lien. *See Park City Meat Co. v. Comstock Silver Mining Co.*, 36 Utah 145, 155, 103 P. 254, 260 (1906); *Eccles Lumber Co. v. Martin*, 31 Utah 241, 249, 87 P. 713, 717 (1906); *see also Parsons v. Keeney*, 98 Conn. 745, 749, 120 A. 505, 507 (1923); *Beall Pipe & Tank Corp. v. Tumac Intermountain, Inc.*, 108 Idaho 487, 490, 700 P.2d 109, 112 (Ct.App.1985); *Consolidated Elec. Distribs., Inc. v. Jepson Elec. Contracting, Inc.*, 272 Or. 376, 382, 537 P.2d 80, 82 (1975). Thus, courts look to see whether interested parties have been informed of the existence of the lien and whether the lien has misled or prejudiced those parties. *See Eccles*, 87 P. at 717; *see also Beall*, 700 P.2d at 112; *Horseshoe Estates v. 2M Co.*, 713 P.2d 776, 781 (Wyo. 1986). When lien notices have sufficiently informed interested persons that a lien exists on identifiable property and the complaining party has not been misled by the notice, the purpose of the provisions has not been thwarted and courts are inclined to find substantial compliance. *See, e.g., Horseshoe*, 713 P.2d at 781.

▉ As we analyze each of the Banks' challenges to the lien description, our main purpose is to determine whether the notice adequately informed the Banks of the existence of the lien and whether the Banks were prejudiced, as a matter of law, by the descriptive terms. "Absent any such claim of prejudice or being misled in any manner by the description[s] which [appear] in the lien statement, we [will] hold that it was sufficient." *Id.*[10]

1. *Inclusion Of More Than One Unit Without Designating Each*

▉ Section 38–1–7 provides, with our emphasis, that every notice of lien must contain "a description of the property to be charged with the lien, *sufficient for identi-*

*fication.*" Utah Code Ann. § 38–1–7 (Supp.1983). Section 38–1–8 provides in pertinent part: "Liens against two or more buildings ... owned by the same person or persons may be included in one claim; but in such case the person filing the claim must designate therein the amount claimed to be due to him on each of such buildings." Utah Code Ann. § 38–1–8 (1988). The Banks argue that these two sections require Projects to allocate its contract claims among all the relevant condominium units.

We begin our analysis with the first of three cases dealing with section 38–1–8 and its predecessor. In *Eccles Lumber Co. v. Martin*, 31 Utah 241, 87 P. 713 (1906), the owner of property on which a mechanic's lien had been filed argued that a lien notice was invalid because it failed to separately state amounts due on different structures. This court construed the predecessor statute to section 38–1–8, which contains language identical to that in section 38–1–8, and definitively stated that a blanket lien was not invalid for failing to allocate the amounts due. *Eccles*, 87 P. at 717. The lien claimant's failure did "not affect nor concern the owner of the property." *Id.* He was "fairly informed of the amount claimed against his property." *Id.* Rather, allocation was necessary "to protect the interests of the lien claimants between and among themselves." *Id.*

The next case in which we discussed the issue was *United States Building & Loan Association v. Midvale Home Finance Corp.*, 86 Utah 506, 44 P.2d 1090 (1935). In *Midvale Home*, a corporation promoted the construction and sale of homes in a subdivision. When the corporation defaulted on its construction loan, the loan company brought suit to foreclose its mortgage on the subdivision property. We were called upon to determine the priorities among the mortgage, several mechanic's liens, and the interests of the individual home purchasers. The home purchasers argued that they had priority over the lien

---

10. It is not enough for the Banks to show that other persons might have been prejudiced by the lien notice. In order to prevail, the Banks must show that they were somehow misled or prejudiced. *See supra* note 5.

claimants because the lien claimants did not allocate amounts due on the various houses constructed in the subdivision. The purchasers attempted to distinguish *Eccles* on the basis that *Eccles* involved only the original owner. We rejected this argument, concluding that the mechanic's liens "attached before any of the claims of the unit holders." *Id.* at 519, 44 P.2d at 1096.

The final case in which we dealt with this subject was *Utah Savings & Loan Association v. Mecham*, 12 Utah 2d 335, 366 P.2d 598 (1961). In *Mecham*, a claimant filed a lien covering numerous subdivision lots. Some of the lots were owned by the Mechams, and some, by another individual. The lien failed to allocate the amounts due on each lot. Mecham argued that the lien was invalid. We affirmed the general rules in *Eccles* and *Midvale Home* but concluded that the lien claimant could only aggregate claims if the various lots and structures described in the lien were owned by the same person.

As in *Midvale Home*, the Banks in this case acquired their interests in the property subsequent to the time the mechanic's lien attached. Unlike the situation in the *Mecham* case, Bradshaw was apparently the only owner of the affected property when the lien attached, i.e., when construction started. Finally, the Banks do not argue that the lien misled them as to the claimed lien, nor have they demonstrated any prejudice from the aggregation of the claims in this case. Thus, we hold that the lien notice was not invalid, at least as against the Banks, simply because Projects failed to segregate the contract amounts attributable to individual condominium units.

### 2. Describing More Property Than Was Subject To Lien

▇▇▇▇▇ The Banks argue that even if Projects was not required to segregate the claims attributable to each condominium unit, the lien was invalid for describing

more property than was properly subject to the lien. However, the general rule is that the inclusion of

> more land than that to which the lien may properly attach does not vitiate the lien upon so much of the land as is encompassed within the description and to which a lien may properly attach, at least if the description is not fraudulent or grossly misleading and innocent third parties are not affected.

Annotation, *Sufficiency of notice, claim, or statement of Mechanic's lien with respect to description or location of real property*, 52 A.L.R.2d 12, 83 (1957); *see also Adams Tree Serv., Inc. v. Transamerica Title Ins. Co.*, 20 Ariz.App. 214, 511 P.2d 658, 663 (1973) (valid portion of lien can be severed from invalid portion); *Beall Pipe & Tank Corp. v. Tumac Intermountain, Inc.*, 108 Idaho 487, 700 P.2d 109, 112 (Ct.App.1985) ("the land properly subject to the lien is for the court to determine"); *Park City Meat Co. v. Comstock Silver Mining Co.*, 36 Utah 145, 103 P. 254, 259 (1909) ("court may limit the amount [of land] to what may be necessary"); *Horseshoe Estates v. 2M Co.*, 713 P.2d at 781 (lien which contained "no adequate description of the property" upheld where no claim of prejudice or being misled); *Engle v. First Nat'l Bank*, 590 P.2d 826, 832 (Wyo.1979) (validating lien which described entire ranch rather than small parcel upon which house was constructed since no showing of prejudice by bank).

We are persuaded that no purpose of the mechanic's lien statute would be served by totally invalidating a lien which overdescribes the property upon which the lien can properly attach. There is no evidence in the record to suggest that the description was fraudulent. Moreover, the Banks do not argue that they were misled or prejudiced by the description. Therefore, we cannot say, as a matter of law, that the overly broad description results in the lien's invalidity as to the Banks.[11]

---

**11.** At the risk of unnecessary repetition, we reiterate that in holding that the description does not invalidate the lien as to the Banks, we do not mean to suggest that the result would be the same for others. The lien, for example, is ineffective as to the phase II property, in which the Banks claim no interest, and inclusion of that property in the lien notices would subject

### 3. *Describing Property Not Initially Owned By Bradshaw*

■ The Banks argue that the description may have included property not even owned by Bradshaw at the time the work was commenced on the project. They argue, citing *Mecham*, that this fact alone invalidates the lien. We do not think *Mecham* stands for this proposition. In *Mecham*, we invalidated the lien because "the materials, for which claim was made, *were not furnished upon buildings* owned by the same person or persons." 12 Utah 2d at 339, 366 P.2d at 601 (emphasis added). Here, the Banks do not argue that any of the materials or labor went into the construction of buildings not initially owned by Bradshaw but simply that some of the land included in the notice was not owned by Bradshaw at the outset of construction.

We fail to see much of a distinction for this case between a lien which includes too much property owned by the same owner and too much property part of which is owned by another person. In either event, the court can determine what part of the property is actually subject to the lien. *Beall Pipe & Tank Corp. v. Tumac Intermountain, Inc.*, 108 Idaho at 498, 700 P.2d at 112. Whether the other person would have an action for slander of title is a separate matter. *See supra* note 11. Again, the Banks do not complain that they were actually misled or prejudiced by the notice. Thus, under these facts, the overly expansive property description did not compromise any purpose of the statute and does not invalidate the lien as to the Banks.

### 4. *Inclusion Of Separate Contracts In One Lien*

The Banks also argue that the lien must fail because the construction work on the property was performed under two separate contracts. Although the Banks advance this argument, they fail to cite much authority to support their position or to give any policy reasons for adopting such a rule. Utah courts have not addressed this question before, and there is a split of authority among other jurisdictions which have considered it.

■ Some courts have held that when work is performed under separate contracts, the work may not be aggregated into a single lien claim. Rather, a separate notice must be recorded for each contract. *See, e.g., F.A. Drew Glass Co. v. Eagle Mill*, 1 Kan.App. 614, 42 P. 387, 390 (1895); *Schively v. Radell*, 227 Pa. 434, 441, 76 A. 209, 211 (1910). Other jurisdictions, however, have allowed lien claimants to file a single notice even though the work was performed under more than one contract. *See, e.g., Alabama State Fair & Agricultural Ass'n v. Alabama Gas Fixture & Plumbing Co.*, 131 Ala. 256, 31 So. 26, 28 (1901); *Booth v. Pendola*, 88 Cal. 36, 25 P. 1101, 1101 (1891); *Parsons v. Keeney*, 98 Conn. 745, 749, 120 A. 505, 507 (1923); *Saint Joseph's College v. Morrison, Inc.*, 158 Ind.App. 272, 302 N.E.2d 865, 874–76 (1973); *Consolidated Elec. Distrib., Inc. v. Jenson Elec. Contracting, Inc.*, 272 Or. 376, 537 P.2d 80 (1975); *Fischer v. Meiroff*, 192 Wis. 482, 484, 213 N.W. 283, 285 (1927).

After reviewing the various cases, we find more persuasive the cases which have allowed the aggregation of claims arising under more than one contract. In *Consolidated Electric*, one of the comparatively more recent cases, the Oregon Supreme Court allowed a lien claimant to file a single lien notice covering two contracts with separate owners. Although the court stated that it did not favor the practice, it noted that each owner was sufficiently notified of the lien against its property and no "prejudice [had] been suffered by the defendants in any material respect." 272 Or. at 383, 537 P.2d at 83. The holding of *Consolidated Electric* significantly departed from earlier Oregon case law. *See, e.g., Dimitre Elec. Co. v. Paget*, 175 Or. 72, 151 P.2d 630 (1944). In changing its position, the Oregon court recognized that "the modern trend [in mechanic's lien law] is to dispense with arbitrary rules which have no demonstrable value in a particular fact situation." *Consolidated Elec. Dist., Inc.*, 272 Or. at 380, 537 P.2d at 82.

---

Projects to appropriate relief in a slander of title action. *See supra* note 5.

The reasoning in *Consolidated Electric* makes sense, and we adopt that position in this case. Again, the Banks do not argue that the notice failed to adequately notify them of the existence of the lien or in any way prejudiced them. Thus, we hold that the inclusion of claims arising under two separate contracts in a single lien notice did not invalidate Projects' lien.

### 5. *Summary*

The Banks do not seriously claim that any of the alleged description failures misled or prejudiced them. The lien notices, while not a model of clarity and precision, appear to have adequately accomplished the purposes of the statute as concerns the Banks. Thus, we hold that Projects' lien notice substantially complied with sections 38-1-7 and 38-1-8 of the mechanic's lien statute. Accordingly, the lien is valid, at least as between the parties to this appeal.

### V. INVALIDITY OF THE LIEN UNDER SECTION 57-8-19

The Banks also argue that the lien notice was invalid under the Condominium Ownership Act, which provides in pertinent part, with our emphasis:

> *Subsequent to recording the declaration* as provided in this act, and while the property remains subject to this act, *no lien shall thereafter arise or be effective* against the property. During such period liens or encumbrances shall arise or be created only against each unit....

Utah Code Ann. § 57-8-19 (1953). The Banks argue that Projects' lien arose and was effective only after recordation of the condominium declaration. Thus, they argue, Projects was required to file a notice of lien for each specific condominium unit.

Utah appellate courts have not had an opportunity to interpret section 57-8-19 in this context. However, both the Montana and Wisconsin Supreme Courts have interpreted statutes nearly identical to Utah's in contexts similar to this case. *See Hostetter v. Inland Dev. Corp.*, 172 Mont. 167, 561 P.2d 1323 (1977); *Stevens Constr.*

*Corp. v. Draper Hall, Inc.*, 73 Wis.2d 104, 242 N.W.2d 893 (1976).

The facts in *Hostetter, Stevens,* and the instant case are essentially the same. In each case, the developer contracted for the construction of condominium units and construction work began. Thereafter, the developers filed condominium declarations. Some time later, the contractors filed mechanic's liens which described the entire property on which the condominium complex was constructed and failed to allocate separate amounts to the different units. In each case, the defendants argued that a blanket lien over the entire project was inappropriate once the condominium declaration had been filed.

The courts in both *Hostetter* and *Stevens* held that the blanket lien was sufficient. *Hostetter,* 172 Mont. at 173, 561 P.2d at 1326-27; *Stevens,* 73 Wis.2d at 114, 242 N.W.2d at 898. Both courts noted that the key factor was the point when the liens *arose* and *became effective* against the property; both courts held that this occurred at the commencement of construction. *Hostetter,* 172 Mont. at 172-73, 561 P.2d at 1326; *Stevens,* 73 Wis.2d at 114, 242 N.W.2d at 898. The filing of the lien notice merely preserved and perfected the lien. *Stevens,* 73 Wis.2d at 114, 242 N.W.2d at 898. The only effect that the condominium declaration had was to make the blanket lien proportionately effective against each unit constructed under the subject contract along with its corresponding undivided interest in the common area. *Hostetter,* 172 Mont. at 174, 561 P.2d at 1327; *Stevens,* 73 Wis.2d at 114, 242 N.W.2d at 898.

The Banks attempt to distinguish *Hostetter* and *Stevens.* They note that, unlike this case, the work in those cases was done under a single contract. They argue that this fact alone should produce a different result, but they do not state the reasons for their conclusion. We have concluded that a lien notice may include work performed under separate contracts and fail to see why the result should be different when the work is performed on a condo-

minium project.[12]

We find the reasoning in *Hostetter* and *Stevens* sound and adopt their rationale. Section 57–8–19 does not affect the validity of the lien in this case. The lien arose and became effective when Projects commenced work on the project. As previously noted, the lien notice was sufficient to perfect that lien, making the lien valid at least as to the units properly subject to the lien and as between the parties to this appeal. The only effect of section 57–8–19 and the intermediate filing of the declaration was to make the lien proportionately effective against · each unit constructed under the subject contracts and each such unit's corresponding undivided interest in the common area. Having concluded that the lien notice is not facially invalid as to the Banks, we turn now to the separate arguments presented by Valley Bank and Cottonwood Thrift.

## VI. VALLEY BANK DISMISSAL

The trial court granted summary judgment to Valley Bank on the basis of Utah Code Ann. § 38–1–11 (1988). That statute provides in pertinent part:

> Actions to enforce [mechanic's] liens must be begun within twelve months after the completion of the original contract, or the suspension of work thereunder for a period of thirty days. Within the twelve months herein mentioned the lien claimant shall file for record with the county recorder of each county in which the lien is recorded a notice of the pendency of the action, in the manner provided in actions affecting the title or right to possession of real property, or the lien shall be void, except as to persons who have been made parties to the action and persons having actual knowledge of the commencement of the action....

*Id.*

■■ Projects commenced this action and recorded its lis pendens five months after it ceased construction, well within the statutory twelve-month period. It did not, however, add Valley Bank as a defendant until it filed its amended complaint, nearly twenty months after construction ceased. Valley Bank argued, and the trial court agreed, that section 38–1–11 is a statute of limitation [13] which required Projects to name Valley Bank as a defendant within the twelve-month period, on pain of its action against Valley Bank being forever barred. We read section 38–1–11 differently.

Section 38–1–11 has two requirements which serve two different purposes. First, the statute requires the lien claimant to commence his action within twelve months of the completion of the project or suspension of work. *See supra* note 13. Valley Bank argues that the lien claimant is also required by this provision to join all persons having an interest in the property within the twelve-month period. However, the statute does not expressly require the lien claimant to do so and, on the contrary as hereafter explained, obviously contemplates the joinder of defendants not initially

12. In *Hostetter,* the Montana court specifically noted that the blanket lien was effective against the entire condominium project because "the work was performed under one contract, and not a series of separate contracts for each unit." *Hostetter v. Inland Dev. Corp.,* 172 Mont. 167, 170, 561 P.2d 1323, 1325 (1977). Apparently, Montana courts have adopted the position that a single lien may not encompass work performed under multiple contracts. *See Caird Eng'g Works v. Seven-up Gold Mining Co.,* 111 Mont. 471, 487–89, 111 P.2d 267, 276 (1941). We have declined to adopt that position and thus disavow that aspect of the *Hostetter* decision.

13. Although both parties have characterized section 38–1–11 as a statute of limitation, we do not view it strictly as such. Rather, it contains one of the requirements with which the claimant must comply "before [that] party is entitled to the benefits created by the [mechanic's lien] statute." *AAA Fencing Co. v. Raintree Dev. & Energy Co.,* 714 P.2d 289, 291 (Utah 1986). The penalty for not commencing an action to enforce a mechanic's lien within the twelve-month period provided in section 38–1–11 is invalidation of the lien rather than preclusion of the claim as with a traditional statute of limitation. *See, e.g.,* Utah Code Ann. § 78–12–23 (Supp. 1986). The commencement requirement of section 38–1–11 serves as a substantive restriction on the lien action and, unlike a true statute of limitation, is not waived if not pleaded. *AAA,* 714 P.2d at 291.

named after the expiration of the twelve-month period.

■ The second "requirement" of section 38-1-11 is that the lien claimant file a lis pendens within the twelve-month period. However, the limited effect of a failure to comply with this requirement is expressly set forth in the statute. When a claimant fails to file the lis pendens within the twelve-month period, the lien itself is not invalidated, but rather it is rendered void as to everyone except those named in the action and those with actual knowledge of the action. By contrast, it follows logically, timely recordation of the lis pendens imparts constructive notice to all persons concerned with the property of the action to enforce the lien, *see* Utah Code Ann. § 78-40-2 (1989), regardless of whether they were named as parties or had actual knowledge of the action.

Valley Bank's contrary interpretation would render portions of the statute meaningless or nonsensical. *See Millett v. Clark Clinic Corp.*, 609 P.2d 934, 936 (Utah 1980) ("[S]tatutory enactments are to be so construed as to render all parts thereof relevant and meaningful, and that interpretations are to be avoided which render some part of a provision nonsensical or absurd."). For one thing, it would be pointless to provide that a lien would be valid as against persons with actual knowledge of the action to enforce the lien who had not been named as parties in the action as filed within the twelve-month period unless it were fully anticipated that such parties could be brought into the action, by amendment, beyond the twelve-month period. It would make no sense to consider the lien to be valid as against such persons unless it could be enforced against them by joining them in the action as previously commenced. Moreover, failure to join a defendant in the complaint as filed within the twelve-month period cannot be conclusively fatal to the claimant's ability to enforce the lien as against the defendant or it would be meaningless for the statute to refer to the continued effectiveness of the lien, even absent timely recordation of a lis pendens, as against non-parties, like Valley Bank in this case, who have actual knowledge of the action.

■ We conclude that section 38-1-11 should be read as a whole to require a lien claimant to commence a mechanic's lien action and record a corresponding lis pendens within the twelve-month period. Commencing the action preserves the lien. Recording the lis pendens imparts constructive notice of the lien enforcement action to everyone interested in the liened property. Only when the claimant fails to timely record the lis pendens can an interested person argue that it is not subject to the lien, and then only if such person was not named as a party and did not have actual knowledge of the action.

■ In this case, Projects commenced the action and filed the lis pendens within the required twelve-month period. Valley Bank was therefore subject to the lien [14] and could properly be joined by an appropriate amendment to the complaint as was done in this case. The trial court accordingly erred when it dismissed Valley Bank from the action.[15]

## VII. AMBIGUITY OF "PARTIAL" LIEN RELEASE

The trial court granted Cottonwood Thrift & Loan Company's summary judgment motion on two grounds: First, the

---

**14.** It is worth noting that even if Projects had not recorded its lis pendens timely, Valley Bank would still be subject to the lien because it had actual knowledge of Projects' action by no later than August 1984, when it reviewed a title report disclosing the action and commenced a dialogue with Projects concerning the matter.

**15.** Although Valley Bank directs our attention to California and Illinois decisions holding that a lien claimant may in no event add defendants after expiration of the dealine for filing a mechanic's lien action, we are not persuaded by those decisions. As previously noted, unlike California and Illinois statutes, section 38-1-11 is not a true statute of limitation. *See supra* note 13. Moreover, our statute is significantly different from the statutes in California and Illinois because it does not merely impose a deadline for commencement of the action, but goes on to delineate persons who will be subject to the lien even though not joined in the action within the twelve-month period. Our attention is drawn to no decision construing similar language in any other mechanic's lien statute.

court concluded that, "based on undisputed facts," Cottonwood Thrift had reasonably relied upon the recorded lien release. Second, the court concluded that the effect of the release was clear on its face. Projects argues on appeal that the release was ambiguous. It also argues that reasonable reliance is a concept necessarily too fact-sensitive for disposition by summary judgment.

Whether a contract is ambiguous is a question of law. *E.g., Morris v. Mountain States Tel. & Tel. Co.*, 658 P.2d 1199, 1200 (Utah 1983). Moreover, the trial court must determine "whether a contract is ambiguous ... before it takes any evidence in clarification." *Id.* It follows, therefore, that if the contract is clear on its face, the trial court need not—and in fact should not—consider evidence of a contrary meaning.

The release in this case stated in pertinent part that Projects "in consideration of [$90,000] ... does hereby release, satisfy and discharge that certain claim of lien ... against the following described real property." The release then described units 4 and 5. This language is susceptible of no other interpretation but that the two units were completely released from the scope of the lien.[16] The trial court properly construed the release as a matter of law and properly declined to consider evidence of another intent. Consequently, we affirm the trial court's decision to dismiss Cottonwood Thrift from the action.[17]

## VIII. CONCLUSION

The trial court's order and judgment of dismissal are affirmed only as they relate to Cottonwood Thrift.[18] As to Copper State and Valley Bank, we reverse and remand for trial or other appropriate proceedings consistent with this decision.

HALL, C.J., HOWE, Associate C.J., and STEWART and ZIMMERMAN, JJ., concur.

DURHAM, J., having disqualified herself, does not participate herein; GREGORY K. ORME, Court of Appeals Judge, sat.

---

**16.** Projects argues that the release was ambiguous because the word "Partial" was added to the "Release of Lien" heading. However, in the context of this case, the release clearly was "partial" because it only released two of the eight units otherwise covered by the lien notice. We do not believe that the addition created any ambiguity in the instrument.

> In the determination of the real character of a contract, courts will always look to its purpose rather than to the name given it by the parties, and where a conflict exists between a name attempted to be applied to a particular contract and the language of the contract itself, the name will be rejected as inapplicable.

17 Am.Jur.2d *Contracts* § 269 (1964) (footnote omitted).

**17.** Because we agree that the release was clear and was not ambiguous, we need not address Projects' reasonable reliance arguments.

**18.** The Banks request on appeal that we award attorney fees based upon Utah Code Ann. § 38–1–18 (1988), which provides: "In any action brought to enforce any lien under this chapter the successful party shall be entitled to recover a reasonable attorneys' fee, to be fixed by the court, which shall be taxed as costs in the action." In view of our holding, except as concerns Cottonwood Thrift, determination of any party's "success" is clearly premature. In the case of Cottonwood Thrift, we note that it, along with the other banks, did not request attorney fees as part of its motion for summary judgment. We will not entertain issues raised for the first time on appeal. *Zions First Nat'l Bank v. National Am. Title Ins. Co.*, 749 P.2d 651, 657 (Utah 1988). Therefore, we decline to consider Cottonwood Thrift's request for fees even though it has successfully defeated Projects' claims against it.