*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 14**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

NEW STAR GENERAL CONTRACTORS, INC.,
*Appellee,*

*v.*

DUMAR, LLC and DUANE SHAW,
*Appellants.*

No. 20230639
Heard December 13, 2024
Filed May 22, 2025

On Direct Appeal

Seventh District Court, Grand County
The Honorable Don M. Torgerson
No. 200700055

Attorneys:

Brian J. Babcock, Andrew L. Berne, Salt Lake City, for appellee

J. Tayler Fox, John R. Richardson, Salt Lake City, for appellants

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, JUSTICE HAGEN, and JUSTICE POHLMAN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1 New Star General Contractors, Inc. (New Star) sued to enforce its construction lien on twelve condo units in a large development in Grand County after the developer, Sage Creek at Moab, LLC (Sage Creek), failed to pay for New Star's construction work. The units' owners, Dumar, LLC, and Duane Shaw (collectively, Dumar), challenged the lien on multiple grounds. The district court ruled that New Star could enforce its lien. Dumar appeals.

¶2    Dumar first challenges the two sets of preliminary notices New Star filed with the state construction registry to preserve its lien rights. It asserts the first preliminary notices—filed for the whole development—could only support a lien for the sitework. And it argues the second preliminary notices—specific to Building C, the site of the twelve condos at issue here—did not list the right parcel numbers as required by Utah Code section 38-1a-501. We assume without deciding that New Star was required to file the second preliminary notices. But we conclude that, despite New Star's failure to include the correct parcel numbers, the second preliminary notices substantially complied with the statute because a reasonably diligent search of the registry would have returned the preliminary notices. We therefore decline to analyze the first preliminary notices.

¶3    Dumar next argues New Star's lien is invalid because New Star failed to allocate its expenses between the units and the common areas of the building. We hold that the relevant statutes do not require that allocation to establish a valid lien.

¶4    Dumar then asserts the district court miscalculated the amount it owed under the lien. We agree that the district court erred in allocating all the costs of constructing Building C to Dumar, rather than limiting Dumar's liability to its ownership share in the development. We remand for the district court to determine the correct amount Dumar owes under the lien based on Dumar's ownership share.

¶5    Finally, having held that the district court miscalculated the lien amount, we vacate its order dismissing Dumar's excessive lien claim and entering an attorney fee award for New Star. We direct the district court to reconsider both issues on remand.

**BACKGROUND**[1]

¶6    In 2017, Sage Creek contracted with New Star to develop a property in Moab. Together, they hoped to build nine condo buildings, each containing twelve units, for a total of 108 condos. New Star and Sage Creek "entered into a master agreement . . . for the entire development[,] . . . contingent upon financing being available for each building." Then, as construction progressed, they

---

[1] "On appeal from a bench trial, we view the evidence in the light most favorable to the district court's findings." *In re W. Ins. Co.*, 2022 UT 38, ¶ 7 n.1, 521 P.3d 851 (cleaned up).

amended the contract to include specifics for each building. Sage Creek financed the development with a loan from Broadmark Real Estate Management II, LLC (Broadmark), secured by a deed of trust with the development property as collateral.

¶7 In January 2018, to preserve its lien rights, New Star filed three preliminary notices with the state construction registry (first preliminary notices), listing the tax parcel numbers of the three parcels that comprised the entire development. The notices identified Sage Creek as the owner of the development and described the project as "108 NEW CONDO UNITS."

¶8 In November 2018, Sage Creek recorded the condo declaration for the development, establishing new parcel numbers for each condo unit and describing the bounds of each unit and the common areas. The declaration divided ownership of the common areas equally between the 108 units, giving each unit a 1/108 ownership share in the development.[2]

¶9 The next month, Sage Creek and New Star signed a contract amendment for Building C. New Star then filed a second set of three preliminary notices for Building C (second preliminary notices). The notices listed the original three parcel numbers, rather than the new parcel numbers established by the condo declaration for the Building C units.

¶10 In April 2019, Dumar, LLC contracted with Sage Creek to purchase six units in Building C for $3.3 million. Dumar, LLC's minority partner, Shaw, contracted to buy the remaining six units for $3.3 million. Each contract included an ownership interest in part of the development's common areas, as laid out in the condo declaration. Later, Dumar negotiated a $1.65 million credit from Sage Creek, as part of a deal on a different real estate development.

¶11 Dumar closed on its purchases in late April 2019. At closing, Dumar paid off the portion of Broadmark's loan secured by the deed of trust on Dumar's twelve units and its interest in the common areas, releasing the deed of trust from its units.

---

[2] The district court opinion appears to contain a typo, stating that each unit owned a 0.09259% share in the development. The declaration describes a 0.9259% ownership share for each unit, consistent with the court's finding that each unit owned 1/108 of the common areas.

¶12   In total, Building C's construction cost about $3.9 million. Sage Creek paid New Star for some work on Building C. Dumar also paid about $2.75 million in several installments to New Star, as New Star submitted invoices for Building C to Sage Creek. New Star applied most of Dumar's payments toward the outstanding invoices for Building C. But it sometimes applied Dumar's payments to other parts of the development, based on direction from Sage Creek or the age of the outstanding invoices. After Dumar paid all it owed under its agreement with Sage Creek, Sage Creek ran into financial difficulties and failed to pay New Star for the rest of the work on Building C.

¶13 After Sage Creek's default, further work on the development stalled, leaving complete only Building C and three other buildings out of the nine buildings Sage Creek and New Star had originally envisioned. New Star was paid in full for the work on the other three buildings. Broadmark foreclosed its deed of trust on the development. But because Dumar had previously paid off Broadmark's interest in its twelve units and its share of the common areas, Broadmark's foreclosure did not reach Dumar's ownership interest.[3]

¶14   In June 2020, New Star filed a notice of construction lien against Dumar's units, seeking payment of about $1.2 million. After one of New Star's subcontractors filed suit against New Star to recover for its work on Building C, New Star filed a third-party complaint against Sage Creek and Dumar. New Star sought to enforce its contract with Sage Creek and foreclose its construction lien against Dumar.

¶15   In response, Dumar challenged the validity of the lien on several grounds. It asserted that none of New Star's preliminary notices substantially complied with the Construction Lien Statute,[4]

---

[3] Broadmark's foreclosure also did not affect four units in Building E that are not at issue in this appeal.

[4] UTAH CODE §§ 38-1a-101 to -805. Before the legislature enacted the current version in 2012, the statute and caselaw referred to construction liens as "mechanics' liens." *See* Liens for Preconstruction Service and Construction Work, H.B. 131, 2012 Leg., Gen. Sess. (Utah 2012). We refer throughout this opinion to "construction liens" and the "Construction Lien Statute," even when referencing older caselaw.

because the first preliminary notices, which described the whole development, could only support a lien for sitework and not later vertical work on Building C. It then argued that the second preliminary notices used the wrong tax parcel numbers to identify Building C. It also claimed that the construction lien notice was invalid for failing to allocate the amount of the lien between the units and the common areas of Building C. Dumar argued that this omission meant it could not calculate its proportional share of the lien based on its limited ownership interest in the common areas, and thus could not exercise its statutory right to pay off the lien on its units.

¶16 Dumar also filed a counterclaim, asserting that New Star filed an excessive lien against its units. Dumar's theory turned on the impact of the Broadmark foreclosure on the development. Broadmark's foreclosure had wiped out New Star's junior lien against the rest of the development, preventing New Star from collecting unpaid amounts from the other unit owners. But because Broadmark had released its deed of trust on Dumar's units before the foreclosure, New Star's lien remained intact on Dumar's units. Without a lien on the other units, New Star had an incentive to allocate payments to expenses on those units first, ensuring it could recover its costs. Then, it could apply any remaining balance to its lien against Dumar's units in Building C, even though Dumar had already paid its fair share for its units. Based on this logic, Dumar argued that New Star intentionally applied about $475,000 of Dumar's payments to other parts of the development in an attempt to recover more than it was actually owed for Dumar's units.

¶17 After a one-day bench trial, the district court entered a nearly $1.2 million judgment for New Star on its contract claim against Sage Creek. The court also concluded that New Star's lien was enforceable against Dumar. The court rejected Dumar's challenges to the validity of the lien itself, determining that New Star's first preliminary notices were sufficient, and that New Star's lien was valid despite New Star's failure to allocate expenses between the units and the common areas. The court then concluded that New Star could foreclose against Dumar's units to recover the full amount of its lien, reasoning that Dumar owned all twelve units in Building C, and that each unit was responsible for paying 1/12 of the cost of construction of the common areas, adding up to the full balance owed on Building C. The district court also rejected Dumar's excessive lien claim, declared New Star the prevailing

party, and ordered Dumar to pay costs and attorney fees. Dumar appeals.

## ISSUES AND STANDARDS OF REVIEW

¶18 Dumar first challenges New Star's preliminary notices under the Construction Lien Statute. This issue turns on the interpretation of the statute and our caselaw, which we review for correctness.[5]

¶19 Second, Dumar argues that New Star's lien was invalid for failing to delineate between work on Dumar's units and work on the common areas. This is also a question of statutory interpretation, which we review for correctness.[6]

¶20 Third, Dumar asserts that the district court miscalculated the amount it owed under the lien. We review the district court's interpretation of the relevant statutes and the condo declaration for correctness.[7] But we uphold the district court's factual findings unless they are clearly erroneous.[8]

¶21 Fourth, Dumar argues that the district court erred in rejecting its excessive lien claim. Whether New Star's lien was excessive under the statute is a legal question, which we review for correctness.[9]

¶22 Finally, Dumar challenges the district court's award of attorney fees to New Star. We review attorney fee awards for "patent error or clear abuse of discretion."[10]

## ANALYSIS

¶23 Construction liens allow contractors, construction workers, and other laborers to ensure payment for their labor and

---

[5] *See Utah Dep't of Transp. v. FPA W. Point, LLC,* 2012 UT 79, ¶ 9, 304 P.3d 810.

[6] *See id.*

[7] *Id.*; *View Condo. Owners Ass'n v. MSICO, L.L.C.*, 2005 UT 91, ¶ 17, 127 P.3d 697.

[8] *See Jouflas v. Fox Television Stations, Inc.*, 927 P.2d 170, 174 (Utah 1996).

[9] *See Wittingham, LLC v. TNE Ltd. P'ship*, 2024 UT 23, ¶ 30, 554 P.3d 924.

[10] *Laws v. Grayeyes*, 2021 UT 59, ¶ 22, 498 P.3d 410 (cleaned up).

materials by asserting a claim against the property they have improved.[11] Utah's Construction Lien Statute "is remedial in nature and seeks to provide protection to laborers and materialmen who have added directly to the value of the property of another by their materials or labor."[12] The statute, the "result of a legislative give-and-take that balances multiple concerns," also aims to "assur[e] clear notice for property owners" and to "facilitat[e] finality in . . . real estate transactions."[13]

¶24 The Construction Lien Statute states that "a person who provides preconstruction service or construction work on or for a project property has a lien on the project property for the reasonable value of the . . . construction work . . . , as provided in [the Construction Lien Statute]."[14] To preserve their rights to assert a construction lien, contractors must first "file a preliminary notice with the [state construction] registry no later than 20 days after the day" they start construction work.[15] Once the work is complete, a contractor who has gone unpaid may "claim [the] construction lien" by submitting "a notice of construction lien" to the county recorder within the statutory timeframe.[16] The contractor may then sue to enforce the lien, "caus[ing] the property to be sold" to pay off the lien.[17]

¶25 Here, the district court held that New Star had a valid construction lien totaling about $1.2 million "against units 1–12 of

---

[11] *See* 56 C.J.S. *Mechanics' Liens* § 1 (Dec. 2024 update); *see also Projects Unlimited, Inc. v. Copper State Thrift & Loan Co.*, 798 P.2d 738, 743 (Utah 1990).

[12] *Projects Unlimited*, 798 P.2d at 743 (cleaned up).

[13] *VCS, Inc. v. Utah Cmty. Bank*, 2012 UT 89, ¶ 20, 293 P.3d 290 (cleaned up).

[14] UTAH CODE § 38-1a-301(1). The statute includes an exception for qualifying owner-occupied residences, not disputed here. *See id.* (establishing lien rights "[e]xcept as provided in Section 38-11-107").

[15] *Id.* § 38-1a-501(1)(a).

[16] *Id.* § 38-1a-502(1)(a).

[17] *Id.* § 38-1a-704(1); *see also id.* § 38-1a-701. The owner has "the same right of redemption" as in other foreclosure actions. *Id.* § 38-1a-704(1).

Building C" and concluded that the lien "may be foreclosed." On appeal, Dumar argues that the lien was invalid for three reasons: (1) New Star's first preliminary notices, filed before New Star began sitework, were too broad to support New Star's lien against Building C; (2) New Star's second preliminary notices were inadequate because they failed to identify Dumar's units by the correct parcel numbers; and (3) even if one or both sets of preliminary notices were valid, New Star failed to allocate costs between work performed on Dumar's units and work performed on the common areas. In addition to attacking the lien itself, Dumar argues the district court miscalculated the amount it owed under the lien. Dumar then turns to its counterclaim, asserting the district court erred in rejecting its excessive lien claim. And finally, Dumar challenges the district court's attorney fee award.

¶26   We look first to New Star's second preliminary notices—the ones specific to Building C—and conclude that those notices substantially complied with the Construction Lien Statute and could support New Star's lien against the units in Building C. We therefore decline to consider whether New Star's first preliminary notices were adequate. Second, we conclude that New Star's failure to allocate expenses between the units and the common areas of Building C did not invalidate the lien. Third, we hold that the district court incorrectly calculated the amount of the lien by treating Dumar as owning all the common areas of Building C, rather than only 12/108, or 1/9, of the common areas of the development, as listed in the condo declaration. We remand for the court to determine the correct amount owed under the lien. Fourth, having concluded that the district court miscalculated the amount Dumar owed under the lien in the first instance, we remand for the court to reconsider Dumar's excessive lien claim. Fifth, we direct the district court to reconsider its attorney fee award.

I.   NEW STAR'S SECOND PRELIMINARY NOTICES WERE VALID

¶27   We begin with Dumar's claim that New Star's preliminary notices were inadequate to support its construction lien against the units in Building C. Utah Code section 38-1a-501(1)(a) lays out the preliminary notice requirements for a construction lien: "A person who desires to claim a construction lien on real property shall file a preliminary notice with the [state construction] registry no later than 20 days after the day on which the person commences providing construction work on the real property." Contractors who do not "file a preliminary notice as required . . . may not claim

a construction lien."[18] In a suit to enforce a construction lien, "the burden is upon the person filing the preliminary notice to prove that the person has substantially complied with" the preliminary notice requirements.[19]

¶28 In this case, New Star contracted in 2017 to construct the entire Sage Creek development, including 108 condo units. In January 2018, New Star filed the first preliminary notices, which described "108 NEW CONDO UNITS," identified the property owner as Sage Creek, and identified the property by three tax parcel numbers (parent parcels) that covered the entire development area. In November, Sage Creek recorded the condo declaration, establishing new parcel numbers for each unit in the development (child parcels).

¶29 The next month, Sage Creek and New Star signed a new agreement that detailed the cost and planned construction of Building C. Then New Star filed the second preliminary notices for "SAGE CREEK AT MOAB, BLDG C." Those notices listed the same three parent parcel numbers as the first preliminary notices, not the child parcel numbers for each unit in Building C.

¶30 At issue is whether either set of notices was sufficient to support New Star's lien against the units in Building C. The Construction Lien Statute states that "a preliminary notice is effective as to all construction work that the person filing the notice provides to the construction project under a single original contract."[20] An "[o]riginal contract" is "a contract between an owner and an original contractor for preconstruction service or construction work."[21] And a "[c]onstruction project" is "an improvement that is constructed pursuant to an original contract."[22] Relying on these definitions, Dumar asserts that the

---

[18] UTAH CODE § 38-1a-501(1)(e).

[19] *Id.* § 38-1a-501(2)(a). The statute also provides two safe harbors for proving substantial compliance. *See id.* § 38-1a-501(2)(b)–(c); *see also infra* ¶¶ 34–36.

[20] UTAH CODE § 38-1a-501(1)(b).

[21] *Id.* § 38-1a-102(24)(a). The statutory definition excludes contracts between owner-builders and other individuals. *Id.* § 38-1a-102(24)(b).

[22] *Id.* § 38-1a-102(10).

first preliminary notices could not support New Star's lien against the units in Building C because Building C was its own "improvement" and was constructed under a separate "original contract" from the first sitework contract. It then asserts that the second preliminary notices were inadequate because they listed only the parent parcel numbers, rather than the child parcel numbers established when the condo declaration was recorded.

¶31   The district court held that the first preliminary notices were sufficient to cover the entire development, finding that the first preliminary notices "plainly identified the entire Sage Creek development and all 108 units that were anticipated." The court noted that New Star and Sage Creek "had contracted for the project construction before those preliminary notices" were filed. "Sitework and construction began and, when it was time for Building C construction, an amended contract was signed specific to Building C." The court found that the construction of Building C "was not a separate construction project. Instead, it was just one phase of a single ongoing condominium development . . . ." It therefore declined to look at the second preliminary notices, finding them unnecessary to its legal analysis.

¶32   Because we conclude that New Star's second preliminary notices—specific to Building C—substantially complied with the statute, we need not decide whether to adopt Dumar's interpretation of "original contract" and "construction project" in the statute. We also decline to separately address the adequacy of New Star's first preliminary notices.

¶33   We begin by reviewing our caselaw to clarify the framework for evaluating substantial compliance under the Construction Lien Statute. We then apply that framework and determine that New Star's second preliminary notices substantially complied with the preliminary notice requirements, sufficient to support New Star's lien.

*A. A Contractor Substantially Complies if Its Failure to Comply with a Statutory Requirement Does Not Cause Actual Harm or Create the Potential for Harm*

¶34   The Construction Lien Statute states that "[e]xcept as provided in Subsection (2)(b), the burden is upon the person filing the preliminary notice to prove that the person has substantially

10

complied with the requirements of this section."[23] Subsection (2)(b) explains that a person may substantially comply with the preliminary notice requirements if they file "a preliminary notice that links, within the registry, to a preliminary notice filed by an original contractor for the same construction project."[24] Subsection (2)(c) then provides that substantial compliance with certain requirements "may be established by a person's reasonable reliance" on information from earlier-filed construction loan notices, preliminary notices, or building permits.[25]

¶35   While the parties agree that subsections (2)(b) and (2)(c) do not apply to these facts, they dispute the significance of the provisions to New Star's lien claim. Dumar asserts that these two provisions lay out the *only* ways to substantially comply with the preliminary notice requirement. New Star, on the other hand, argues that (2)(b) and (2)(c) are safe harbors and do not define the full scope of substantial compliance.

¶36   We agree with New Star. The plain meaning of "except" in (2)(a) is "with the exclusion or exception of."[26] Subsection (2)(a) thus states that, excluding the circumstances listed in subsection (2)(b), the contractor filing the preliminary notice bears the burden to prove substantial compliance.[27] So under (2)(a), a contractor may substantially comply without satisfying (2)(b). Similarly, subsection (2)(c) states that substantial compliance "may be established" by following that provision.[28] But the permissive language suggests that other methods of proving substantial compliance are possible.[29] Subsection (2)(a)'s general rule loses its meaning if (2)(b) and (2)(c) are the only ways to substantially comply. Instead, as New Star suggests, (2)(b) and (2)(c) are safe

---

[23] *Id.* § 38-1a-501(2)(a).

[24] *Id.* § 38-1a-501(2)(b).

[25] *Id.* § 38-1a-501(2)(c).

[26]  *Except*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/except (last visited Apr. 28, 2025).

[27] *See* UTAH CODE § 38-1a-501(2)(a).

[28] *See id.* § 38-1a-501(2)(c).

[29] *See id.*

harbors, providing a presumption of compliance in some cases, but not defining all possible avenues for substantial compliance.

¶37 Setting aside the safe harbor provisions, the parties next dispute the meaning of substantial compliance. This court has held that substantial compliance "is measured by its potential for harm or prejudice. A defect in compliance may be excused as insubstantial if it cannot have any meaningful impact on other parties."[30] New Star asserts that the court should evaluate only whether a party's failure caused *actual* harm. Dumar argues that a party has not substantially complied if its statutory failure caused even the *potential* for harm.

¶38 Admittedly, our caselaw is somewhat ambiguous about how to measure substantial compliance. In *Projects Unlimited, Inc. v. Copper State Thrift & Loan Co.*, we leaned heavily on the purpose of the Construction Lien Statute, emphasizing the "modern trend . . . to dispense with arbitrary rules [that] have no demonstrable value in a particular fact situation" and emphasizing the right of laborers to be paid.[31] We applied a fact-specific analysis that would uphold the lien unless the contractor's "alleged failures ha[d] compromised a purpose of the [construction] lien statute," or caused actual prejudice to the parties.[32]

¶39 In *VCS, Inc. v. Utah Community Bank*, we emphasized that the Construction Lien Statute embodies the legislature's efforts to balance competing priorities, including the desire that laborers be paid for their work and the importance of notice and finality.[33] We noted that "[c]ompliance with a few—or even many—provisions of a detailed statutory scheme is not the measure of substantial compliance. And just because a statute is detailed does not automatically transform its individual requirements into immaterial technicalities."[34] We then said that "[o]ur cases refuse

---

[30] *VCS, Inc. v. Utah Cmty. Bank*, 2012 UT 89, ¶ 37, 293 P.3d 290.

[31] 798 P.2d 738, 743–44 (Utah 1990) (cleaned up); *see also id.* at 744 (A construction lien "should not be defeated by technicalities, when no rights of others are infringed, and no express command of the statute is disregarded." (cleaned up)).

[32] *Id.* at 744.

[33] 2012 UT 89, ¶ 20.

[34] *Id.* ¶ 36.

to condone the failure to comply with an express command of the statute, at least in circumstances where the act of noncompliance is material rather than harmless."[35]

¶40 In applying the substantial compliance standard to the facts in *VCS*, we first evaluated whether a contractor's error violated "an express statutory command."[36] Finding that it did, we then considered the purpose of the statutory requirement and whether the failure to satisfy it "implicat[ed] a potential for prejudice or harm."[37] Finally, in assessing whether the failure was harmless, we considered whether the contractor had taken any steps to mitigate the potential harm and "adequately fulfill[] th[e] function of the [statutory] requirement."[38]

¶41 Weaving together our caselaw, we hold that a court must first evaluate whether a contractor failed to comply with a provision of the Construction Lien Statute. If the court determines the contractor failed to comply with a statutory requirement, the court must then analyze the harmfulness of that failure. If the failure caused actual harm, then the contractor did not substantially comply, and the analysis ends there.[39] In the absence of actual harm, the court must determine the purpose of the statutory requirement.[40] The court must then assess whether, in light of that purpose and all of the surrounding facts, the failure created the potential for harm.[41] If the failure neither caused actual harm nor created the potential for harm, the court must find substantial compliance. We next apply that substantial compliance framework to New Star's second preliminary notices.

B. *New Star's Second Preliminary Notices Substantially Complied with the Construction Lien Statute*

¶42 We begin by reviewing the preliminary notice section of the Construction Lien Statute to determine whether New Star failed

---

[35] *Id.* (cleaned up).

[36] *Id.* ¶ 39.

[37] *Id.*

[38] *Id.*

[39] *See Projects Unlimited*, 798 P.2d at 744 & n.5.

[40] *See VCS*, 2012 UT 89, ¶¶ 36–39.

[41] *See id.* ¶¶ 37–39.

to comply with any of its provisions. Under Utah Code section 38-1a-501(1)(h), a contractor "shall include" several elements in a preliminary notice, such as the contractor's name and contact information, the name and address of the person who contracted for the work, information about the property owner, and details about the property. The preliminary notice must also include "one of four listed means of identifying the specific piece of real property to which the eventual lien will attach."[42] One option is to identify the property by "the tax parcel identification number of each parcel included in the project property."[43]

¶43 When Sage Creek first contracted with New Star, the development spanned three parent parcels, each with their own parcel numbers. In November 2018, when construction was well underway, Sage Creek recorded the condo declaration, establishing new child parcel numbers for each unit in the development. The next month, New Star filed the second preliminary notices for Building C, listing the three parent parcel numbers, but not the new child parcel numbers.

¶44 Dumar asserts that New Star's second preliminary notices failed to properly identify the property that would be covered by the lien because New Star listed the three parent parcel numbers instead of the child parcel numbers for each unit. Dumar points to Utah Code section 57-8-19(1), found in the Condominium Ownership Act,[44] which states that "[s]ubsequent to recording the [condo] declaration . . . and while the property remains subject to [the Condominium Ownership Act], no lien shall thereafter arise or be effective against the property." Rather, once the declaration is recorded, "liens or encumbrances shall arise or be created only against each unit and the percentage of undivided interest in the common areas and facilities appurtenant to such unit."[45] Based on this statute, Dumar argues that once the condo declaration created the child parcels, no lien could attach to the parent parcels. Preliminary notices listing the parent parcels would also be invalid.

---

[42] *Zion Vill. Resort LLC v. Pro Curb U.S.A. LLC*, 2020 UT App 167, ¶ 3, 480 P.3d 1055; *see also* UTAH CODE § 38-1a-501(1)(h)(vii).

[43] UTAH CODE § 38-1a-501(1)(h)(vii)(A).

[44] *Id.* §§ 57-8-1 to -60.

[45] *Id.* § 57-8-19(1).

¶45 We agree with Dumar that after the declaration had been recorded, a subsequent lien could attach only to individual condo units and the associated undivided interest in the common areas. Because the declaration established new tax parcel numbers for each unit before New Star filed the second preliminary notices, the notices should have included the child parcel numbers, consistent with the statutory requirement to list the parcel number "of each parcel included in the project property."[46] New Star's second preliminary notices therefore did not comply with the Construction Lien Statute.

¶46 The next step of the substantial compliance framework considers whether the failure to comply with the statute led to actual harm. Dumar conceded at oral argument that it suffered no actual harm from New Star's failure to include the child parcel numbers.

¶47 We next consider the purpose of the statutory requirement and whether, in light of that purpose, New Star's error created the potential for harm.[47] Before considering the purpose of preliminary notices here, we look to our caselaw to better understand that standard. In *Projects Unlimited*, we determined that the contractor substantially complied with the verification requirements of the Construction Lien Statute even though the notary "omitted her address and the expiration date of her commission."[48] We held that even assuming those details were required by the statute, an interested party "could certainly confirm [the notarization's] authenticity with the simplest inquiry," and thus there was no possible harm from the failure.[49] But in *VCS* we concluded that a contractor who filed a lis pendens more than 450 days after the deadline did not substantially comply with the statute.[50] The contractor did not "point to any action it took that adequately fulfilled [the notice] function of the lis

---

[46] *Id.* § 38-1a-501(1)(h)(vii)(A).

[47] *See VCS*, 2012 UT 89, ¶¶ 37–39.

[48] *Projects Unlimited*, 798 P.2d at 745–46.

[49] *See id.*

[50] *VCS*, 2012 UT 89, ¶¶ 8, 39.

pendens requirement," and the potential for harm was too high to ignore that failure.[51]

¶48 We now review the purpose of preliminary notices. Preliminary notices ensure that property owners and interested parties have clear notice of a contractor's claim for payment early in the construction process, so that they can act in an informed way while the construction is ongoing. This early, explicit notice prevents surprise, reduces future conflicts, and reduces the burden on owners seeking to transfer their property.[52] Requiring a preliminary notice to include tax parcel numbers for each parcel to which a lien may eventually attach ensures that a preliminary notice is visible in a reasonable search of the state construction registry. Absent a clear way to identify the property subject to a future construction lien, property owners and other third parties may lack notice of the potential lien and the associated risk of foreclosure.

¶49 Given the underlying purpose of providing notice, an error in a preliminary notice that prevented interested parties from finding the notice in a search might create the potential for harm. But where the state construction registry contains several searchable fields, not every error in every field of the preliminary notice will create the potential for harm. A speculative claim that *some* interested party could fail to find the preliminary notices in a registry search based on an error is insufficient. In *Arnold Industries, Inc. v. Love*, we considered whether a reasonably diligent search would have discovered a public record despite an indexing error.[53] We adopt that same standard in the analogous context of a preliminary notice search.

---

[51] *Id.* ¶ 39 (cleaned up).

[52] *Cf. id.* (reasoning that the lis pendens requirement "puts the world on notice that an action has been commenced to foreclose a [construction] lien . . . [,] thereby promot[ing] clear notice, finality, and the alienability of real property").

[53] 2002 UT 133, ¶¶ 31–35, 63 P.3d 721 (finding a property subject to an easement despite an indexing error when the owner could observe the use of the right-of-way and thus had constructive notice to conduct "an investigation of reasonable diligence within the public record" to gain actual notice of the easement).

¶50 A reasonably diligent search of the registry would have returned the preliminary notices here. The Construction Lien Statute generally requires a contractor to "give only one [preliminary] notice for each construction project."[54] And though a contractor must file a preliminary notice by the statutory deadline—usually 20 days after construction work begins[55]—there appears to be no way for a contractor to file a preliminary notice too soon.[56] Accordingly, a contractor could file preliminary notices for each building in an entire development very early in the process, *before* any condo declaration established child parcels. Assuming the early-filed preliminary notices met all of the other statutory requirements, the contractor would have no obligation to file new notices once the child parcel numbers were created.[57] Thus, in any given case, the presence or absence of the unit-specific child parcel numbers on a preliminary notice is merely a quirk of timing. And therefore any reasonably diligent searcher would not rely on the child parcel numbers alone but would search in other ways— by property owner, address, some other identifier in the registry, or by resorting to the county title records to discover the parent parcel numbers for a further search.[58]

¶51 In that context, a reasonably diligent search would turn up New Star's second preliminary notices. The notices listed the parent parcel numbers, the development's address, the developer's name, and the contractor's name. The notices specifically identified Building C. So even absent the child parcel numbers, a person performing a reasonably diligent search would discover the

---

[54] UTAH CODE § 38-1a-501(3)(a).

[55] *Id.* § 38-1a-501(1)(a), (c).

[56] *See id.* § 38-1a-501.

[57] *See id.* § 38-1a-501(3)(a). As noted above, Dumar argues that such a contractor would need to file new preliminary notices for each "construction project" under each "original contract." *See supra* ¶¶ 30–32. We need not address those arguments to resolve this case, and we assume here that our hypothetical contractor filed an appropriate number of notices to satisfy the statutory requirements.

[58] *See generally* UTAH CODE § 38-1a-201(2) (noting the various ways that the "designated agent shall index filings in the registry," including address, owner, and tax parcel number).

preliminary notices and understand that New Star sought to be paid for its work constructing the units in Building C. Thus the failure to include the child parcel numbers on the notices did not create the potential for harm. Because New Star's second preliminary notices substantially complied with the statute, we reject Dumar's attempt to invalidate the lien on that basis.

## II. THE FAILURE TO SEGREGATE UNIT AND COMMON-AREA EXPENSES DOES NOT INVALIDATE THE LIEN

¶52 Dumar next asserts that New Star's lien was invalid because its notice of construction lien failed to separately identify the value of the work performed on the condo units and the common areas. If a contractor asserts a "construction lien against two or more improvements owned by the same person, the [contractor] shall designate the amount claimed to be due on each of the improvements."[59] And a separate provision in the Condominium Ownership Act provides that "liens or encumbrances" against condos "shall arise or be created only against each unit and the percentage of undivided interest in the common areas and facilities appurtenant to such unit in the same manner" as liens against other types of property.[60] Dumar asserts that this second provision means that units and common areas are separate "improvements" against which the contractor must separately "designate the amount claimed to be due."[61] We disagree.

¶53 The Condominium Ownership Act requires that liens against condos be specified against each unit—rather than against a whole building or development.[62] It is less clear, however, that "unit[s]" and "the percentage of undivided interest in the common areas" are two separate improvements against which liens may be levied.[63] Rather, the statute requires that liens be attached only to

---

[59] UTAH CODE § 38-1a-304(2).

[60] *Id.* § 57-8-19(1).

[61] *See id.* § 38-1a-304(2).

[62] *See id.* § 57-8-19(1).

[63] *See id.*; *see also id.* § 38-1a-102(21) (defining "[i]mprovement" as "a building, infrastructure, utility, or other human-made structure or object constructed on or for and affixed to real

(continued . . .)

individual units *together with* their associated interests in the common areas. Under this reading, New Star's notice of construction lien needed to designate the amount claimed against each unit, including any amount attributable to work on the common areas, but the lien did not need to separate out the expenses for the common areas and the costs of constructing the units themselves. New Star's notice of construction lien did list the amount each unit owed under the lien. We therefore reject Dumar's claim that the lien should be invalidated for the failure to allocate.

## III. THE DISTRICT COURT ERRED IN ITS CALCULATION OF THE AMOUNT OWED UNDER THE LIEN

¶54 Having concluded that New Star has a valid lien, we turn to Dumar's claim that the district court incorrectly calculated the amount it owed under the lien. Dumar asks that we "remand to the district court to determine the amount of the lien."

¶55 The parties dispute the standard we should apply in reviewing the district court's factual finding about how much Dumar owed under the lien. New Star asserts that "the calculation of damages including overpayments and underpayments . . . 'involves a finding of fact that we review for clear error.'"[64] Dumar asserts that it does "not challenge the factual findings" of the district court, but instead it "challenge[s] the [district] court's legal conclusion that [Dumar] w[as] responsible for paying for all of the common area expenses in Building C," which it argues we should review for correctness.

¶56 So far as Dumar challenges the interpretation of the applicable statutes and the condo declaration, we review the

---

property; or . . . a repair, modification, or alteration" to one of those items).

[64] (Quoting *Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 10, 288 P.3d 1046.)

district court's conclusions for correctness.[65] But we defer to the district court's factual findings unless they are clearly erroneous.[66]

¶57    Dumar asserts the district court's order required it to pay New Star for lien costs extending beyond its ownership interest in the development. It argues that based on the Construction Lien Statute and condo declaration, its ownership interest extends only to its twelve units plus each unit's 1/108 share in the common areas. In total, it could therefore only be responsible for the costs of the twelve units plus 12/108, or 1/9, of the costs of constructing Building C's common areas. Thus, it argues, the district court erred in finding each unit responsible for 1/12 of the costs of Building C's common areas, adding up to 100% of the common area construction costs for Building C.

¶58    We begin with the statute. "The primary objective of statutory interpretation is to ascertain the intent of the legislature."[67] And "the best evidence of the legislature's intent is the plain language of the statute itself."[68]

¶59    Utah Code section 38-1a-301(1) states that "a person who provides . . . construction work on or for a project property has a lien on the project property for the reasonable value of the . . . construction work." In the context of condos, we also consider the Condominium Ownership Act, which provides:

> In the event a lien against two or more units becomes effective, the unit owners of the separate units may remove their units and the percentage of undivided interest in the common areas and facilities appurtenant to such units from the lien by payment of the fractional or proportional amount attributable to each of the units affected. Such individual payment

---

[65] *See Utah Dep't of Transp. v. FPA W. Point, LLC*, 2012 UT 79, ¶ 9, 304 P.3d 810 (reviewing a court's statutory interpretation for correctness); *View Condominium Owners Ass'n v. MSICO, L.L.C.*, 2005 UT 91, ¶ 17, 127 P.3d 697 (reviewing a court's interpretation of a condo declaration for correctness).

[66] *See Jouflas v. Fox Television Stations, Inc.*, 927 P.2d 170, 174 (Utah 1996).

[67] *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 (cleaned up).

[68] *Id.* (cleaned up).

> shall be computed by reference to the percentages appearing in the declaration. Subsequent to any payment, discharge or other satisfaction, the unit and the percentage of undivided interest in the common areas and facilities appurtenant thereto shall be free and clear of the lien so paid, satisfied or discharged. Partial payment, satisfaction or discharge shall not prevent the lienor from proceeding to enforce the lienor's rights against any unit and the percentage of undivided interest in the common areas and facilities appurtenant thereto not so paid, satisfied or discharged.[69]

Under the plain language of the Condominium Ownership Act, payment owed to satisfy a lien "shall be computed by reference to the percentages appearing in the declaration."[70] And according to the declaration, each of Dumar's twelve units owns a 1/108 interest in the development, for a total ownership of 1/9 of the common areas of the development. The district court therefore erred in finding Dumar responsible for all of the common areas of Building C, a scope broader than Dumar's ownership interest.

¶60 New Star argues that this reading of the two statutes—limiting unit owners' liability under a lien to their proportional interest in the development—would mean that in some cases a contractor could foreclose only on a unit's interest in the common areas of a development, making liens an ineffective remedy. But our reading does not compel that result. Rather, a unit owner's proportional interest in the common areas of the development—as described in the declaration—will generally be tied to ownership of a unit.[71] Thus, though Dumar may own an interest in the common areas of Building D, for instance, New Star's remedy to

---

[69] UTAH CODE § 57-8-19(2).

[70] *Id.*

[71] *See, e.g., id.* (stating that payment of the full lien amount leaves "the unit and the percentage of undivided interest in the common areas and facilities appurtenant thereto . . . free and clear of the lien" while partial payment does not bar the lienor from enforcing the lien through foreclosure "against any unit and the percentage of undivided interest in the common areas and facilities appurtenant thereto").

recover any amount owed for Building D's construction is to foreclose on Dumar's units in Building C. So long as a contractor follows the statutory requirements to provide notice to all units against which a lien may attach of the contractor's intention to recover for work performed, the construction lien provides a remedy to ensure payment of all expenses, across an entire development.

¶61 Though we hold that New Star may not force Dumar to pay for Building C's construction costs beyond its ownership interest in the building, both parties seem to agree that Dumar's interest in the common areas of the development extends *beyond* Building C, and thus that Dumar should be responsible for paying 1/9 of the common area costs of the other buildings.[72] The record and briefing leave ambiguous exactly how New Star was paid for the construction of the other three buildings. But because Broadmark's foreclosure of its deed of trust did not affect Dumar's units, it cannot have extinguished New Star's lien against Dumar's ownership share in the common areas of the other buildings.

¶62 To the extent that Dumar owns a share of the common areas of the other buildings, and has not paid its portion of the costs of construction of those buildings, any unpaid amount may persist as a lien against its twelve units in Building C. And Dumar's units are not "free and clear" of New Star's lien until it has paid that "fractional or proportional amount attributable to" its units.[73] We do not comment on whether New Star has met all the other statutory requirements to enforce a lien for the expenses of the other buildings against Dumar. Rather we leave to the district court on remand to determine, under this correct statutory interpretation, how much Dumar must pay to release the lien on its twelve units.

---

[72] *See generally* 4 PATTERN DISCOVERY: PREMISES LIABILITY § 54:6 (3d ed. Aug. 2024 update) ("Where the [construction] lien arises out of an improvement to common elements in a condominium project, the land impressed with the lien may extend beyond the improved property. An individual property owner's unit may be exposed to the construction lien proportionately with that unit owner's liability for common expenses.").

[73] *See* UTAH CODE § 57-8-19(2).

## IV. WE REMAND FOR THE DISTRICT COURT TO RECONSIDER DUMAR'S EXCESSIVE LIEN CLAIM

¶63 We next consider Dumar's excessive lien claim. Utah Code section 38-1a-308 creates a cause of action against anyone who "intentionally submits for recording a . . . notice of construction lien against any property containing a greater demand than the sum due" when "by submitting the notice, the person intends: (i) to cloud the title; (ii) to exact from the owner or person liable by means of the excessive notice . . . more than is due; or (iii) to procure any unjustified advantage or benefit."[74] A finding that an individual filed an excessive lien triggers liability "to a third party who is affected by . . . the notice of construction lien for twice the amount by which the lien notice exceeds the amount actually due or the actual damages incurred by the owner, original contractor, or subcontractor, whichever is greater."[75]

¶64 Both before the district court and on appeal, Dumar argued that New Star inappropriately applied about $475,000 of Dumar's payments to development costs outside of Building C. Dumar argues that New Star funneled its payments this way because "the rest of the [d]evelopment was subject to [Broadmark]'s [d]eed of [t]rust, which would be senior to any lien notice of New Star's." Dumar asserts that by applying its payments this way, New Star intentionally increased the amount it could recover in a lien against the units in Building C, which were not subject to Broadmark's superior lien.

¶65 As a first step, the party claiming an excessive lien must show that "the lien contained a 'greater demand than the sum' actually owed."[76] If the lien did claim more than was owed, the court must decide whether the contractor, by filing for an excessive amount, intended to "cloud the title; . . . exact from the owner . . . more than [wa]s due; or . . . procure any unjustified advantage or benefit."[77]

---

[74] UTAH CODE § 38-1a-308(2)–(3).

[75] *Id.* § 38-1a-308(3)(b).

[76] *Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 73, 288 P.3d 1046 (quoting UTAH CODE § 38-1-25(1) (2005) (current version at UTAH CODE § 38-1a-308(2)(a))).

[77] UTAH CODE § 38-1a-308(2)(b).

¶66 Here, the district court reasoned that New Star had no contractual obligation to Dumar to allocate Dumar's payments to Building C. It therefore held that New Star's lien claim was not excessive. The parties dispute whether the district court's conclusion turned on the first or second step of the excessive lien analysis. Under their alternative readings, the district court reasoned either that (1) because New Star had no duty to allocate Dumar's payments to Building C, New Star's lien did not claim an amount greater than it was owed; or (2) New Star's lack of duty to allocate payments in a certain way supported an implicit finding that New Star did not intend to file an excessive lien claim.

¶67 The district court's analysis leaves ambiguous why it dismissed Dumar's excessive lien claim. And, given our holding that the court miscalculated the amount owed under the lien, the district court's reasoning about whether New Star claimed more than it was owed may be different on remand. We also note that, under our analysis, Dumar's ownership interest extended beyond Building C, such that the allocation of Dumar's payments to other buildings might have been appropriate. Under the circumstances, we remand the excessive lien claim for the district court to determine whether New Star's lien claimed more than Dumar owed based on its ownership interest in the property, and, if so, whether Dumar's evidence established the requisite intent for the court to impose liability under an excessive lien claim.

V. WE REMAND FOR A NEW ATTORNEY FEE AWARD

¶68 Last, we turn to Dumar's claim that the district court erred in awarding New Star attorney fees as the successful party in this lien action. Subject to an exception not applicable here, "in any action brought to enforce any lien under this chapter the successful party shall be entitled to recover reasonable attorney fees, to be fixed by the court, which shall be taxed as costs in the action."[78] But a person filing an excessive lien under Utah Code section 38-1a-308 "may not recover attorney fees under" this provision.[79]

¶69 Here, the district court determined that New Star was the prevailing party and awarded attorney fees accordingly. Because we remand for a new determination of the amount owed under the lien, as well as reconsideration of Dumar's excessive lien claim, we

---

[78] UTAH CODE § 38-1a-707(1).

[79] *Id.* § 38-1a-707(2).

also vacate the district court's attorney fee award and direct the court to make a new determination as to the prevailing party and a reasonable attorney fee award.

¶70 Both parties also request attorney fees on appeal. We have "interpreted attorney fee statutes broadly so as to award attorney fees on appeal where a statute initially authorizes them."[80] We have also recognized that a prevailing party who is entitled to "reasonable attorney fees," whether by contract or by statute, is entitled to reasonable fees incurred on appeal.[81] We therefore interpret the Construction Lien Statute's attorney fee provision as entitling the successful party to recover fees incurred on appeal.[82] Accordingly, we instruct the district court on remand to include appellate attorney fees in its ultimate fee award. In calculating such an award, the district court may consider whether the prevailing party "retain[ed] all of their trial victory on appeal" and adjust the fee award so that the prevailing party "do[es] not recover fees attributable to issues on which they did not prevail."[83]

## CONCLUSION

¶71 Dumar appeals the district court's judgment that New Star has a valid lien against its twelve condo units and its share of the common areas of the development. We conclude that New Star's lien is valid, rejecting Dumar's challenges to New Star's preliminary notices and New Star's failure to allocate expenses between the units and the common areas. But we hold that the district court misapplied the Construction Lien Statute when it deemed Dumar responsible for the costs of construction of all of Building C, despite the condo declaration that allocated Dumar's ownership interest differently. We accordingly remand for the district court to recalculate the amount owed under the lien, and to reconsider Dumar's excessive lien claim and its attorney fee award.

---

[80] *Salmon v. Davis Cnty.*, 916 P.2d 890, 895 (Utah 1996).

[81] *See id.* at 896; *Westgate Resorts, Ltd. v. Adel*, 2016 UT 24, ¶¶ 31–33, 378 P.3d 93; *Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998).

[82] *See* UTAH CODE § 38-1a-707(1); *see also Zion Vill. Resort LLC v. Pro Curb U.S.A. LLC*, 2020 UT App 167, ¶ 59, 480 P.3d 1055 (granting an attorney fee award, including appellate attorney fees, to the party prevailing in a construction lien action).

[83] *Valcarce*, 961 P.2d at 319.